UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBIN H., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-507-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM |
| | § | DECISION AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Robin H. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 9).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 6, 7. Plaintiff also filed a reply brief. *See* ECF No. 8. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 6) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 7) is **GRANTED**.

## BACKGROUND

Plaintiff protectively filed an application for DIB on March 23, 2016, alleging disability beginning January 21, 2016 (the disability onset date), primarily due to migraine headaches. Transcript ("Tr.") 17, 158-59, 173. Plaintiff's claim was denied initially on May 24, 2016, after which she requested an administrative hearing. Tr. 17. On May 3, 2018, Administrative Law Judge Gregory Hamel ("ALJ Hamel") conducted a video hearing from Falls Church, Virginia. Tr. 17.

Plaintiff appeared and testified in Buffalo, New York, and was represented by Zachary Zabawa, an attorney. *Id*. David Van Winkle, an impartial vocational expert, also appeared and testified at the hearing. *Id*.

ALJ Hamel issued an unfavorable decision on June 25, 2018, finding that Plaintiff was not disabled. Tr. 17-27. On April 23, 2019, the Appeals Council denied Plaintiff's request for further review, after which ALJ Hamel's June 25, 2018 decision became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g). Tr. 1-6. After Plaintiff filed a complaint in the Western District of New York, the parties stipulated to remand ALJ Hamel's decision for further proceedings. Tr. 565-66. The Court issued judgment on January 24, 2020 (Tr. 567), and on May 26, 2020, the Appeals Council ordered a new hearing (Tr. 569).

On November 20, 2020, Administrative Law Judge Paul Georger ("the ALJ") held a telephonic hearing,[1] at which Plaintiff appeared and testified. Tr. 457. Plaintiff was represented by Nicholas DiVirgilio, an attorney. *Id*. Zachary Fosberg, an impartial vocational expert, also appeared via telephone at the hearing. *Id*. The ALJ considered the case *de novo* and issued an unfavorable decision on December 29, 2020, finding Plaintiff not disabled. Tr. 454-68. Thereafter, the ALJ's December 29, 2020 decision became the Commissioner's final decision, and Plaintiff subsequently commenced this action.

## **LEGAL STANDARD**

### I.   **District Court Review**

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. §

---

[1] Due to the extraordinary circumstance presented by the Coronavirus Disease 2019 ("COVID-19") pandemic, all participants attended the hearing by telephone. Tr. 457.

405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.    The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or

mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his December 29, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since January 21, 2016, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine, right lower extremity fracture status-post arthropathy and reconstruction, obesity, and chronic migraine headaches (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)[2] except the claimant can never climb ramps, stairs, ladders, ropes or

---

[2] "Sedentary" work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain

scaffolds. The claimant can never balance, kneel, crouch or crawl but can occasionally stoop. The claimant can never work at unprotected heights, near moving mechanical parts, or operate a motor vehicle. The claimant can have exposure to quiet noise environments. The claimant must avoid exposure to bright light due to her migraine headaches.

6. The claimant is capable of performing past relevant work as a receptionist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 21, 2016, through the date of this decision (20 CFR 404.1520(f)).

Tr. 457-67.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits filed on March 23, 2016, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 468.

## ANALYSIS

Plaintiff asserts two points of error, both of which challenge the ALJ's RFC finding. First, Plaintiff argues that the ALJ erred when he afforded partial weight overall to the opinion of neurological consultative examiner John Schwab, D.O. ("Dr. Schwab"), the only opinion in the record, and assessed additional limitations not identified in any opinion. *See* ECF No. 6-1 at 11-17. According to Plaintiff, the ALJ relied on his own lay interpretation of the raw medical evidence and, therefore, created a gap in the record requiring further development. *See id*. at 15-16. In her second point, Plaintiff argues that, to the extent the ALJ relied on Dr. Schwab's opinion, it could not have constituted substantial evidence, because it was stale. *See id*. at 17-20.

In response, the Commissioner argues that the ALJ is not required to rely on an expert opinion in formulating the RFC, as Plaintiff argues. *See* ECF No. 7-1 at 14-19. Further, argues the Commissioner, the ALJ properly afforded Dr. Schwab's opinion reduced weight, but provided

amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Plaintiff the benefit of the doubt to find a more restrictive RFC based on the totality of the record before him. *See id*. As to Plaintiff's second point, the Commissioner argues that, because Dr. Schwab rendered his opinion during the relevant period and the evidence reveals that Plaintiff's migraines did not significantly worsen since Dr. Schwab's opinion, his opinion was not stale. *See id*. at 23-26.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review, the Court finds that the ALJ's decision was supported by substantial evidence, including the opinion of Dr. Schwab, Plaintiff's generally conservative treatment, her relatively normal findings on examination, and her reported activities. Based on the record as a whole, the ALJ reasonably determined that Plaintiff was capable of performing sedentary work with additional limitations. Accordingly, the Court finds no error.

On May 20, 2015, Plaintiff established care at Lakeshore Family Medicine ("Lakeshore") complaining of headache and heartburn. Tr. 347-51. On October 14, 2015, Plaintiff was seen for intermittent headaches that had been present for several days. Tr. 337-39. Physical examination findings were unremarkable (Tr. 338), and Toradol injection was administered (Tr. 339). On November 13, 2015, Plaintiff was seen for an annual physical exam, denying new complaints. Tr. 333-36. On December 30, 2015, Plaintiff was seen for an upper respiratory infection, for which

she was prescribed antibiotics. Tr. 325-26. On January 12, 2016, Plaintiff was seen for conjunctivitis and prescribed eye drops. Tr. 320-22.

On April 7, 2016, Plaintiff was seen at DENT Neurological Institute ("DENT") for a consultation regarding her headaches. Tr. 277-79. Plaintiff reported having headaches for years which were now increasing in frequency and intensity. Tr. 277. She was diagnosed with chronic migraine without aura, and myofascial pain. Tr. 279.

On May 2, 2016, Dr. Schwab performed a neurologic examination. Tr. 290-92. Plaintiff reported migraines beginning in her late teens that worsened in her 30s. Tr. 290. She reported three to four migraines per week lasting an hour to two days. *Id*. Symptoms increased with bright lights or loud noise, and she obtained relief by taking sumatriptan or going to a dark quiet room. *Id*. Upon examination, Plaintiff exhibited grossly normal gait; she was oriented in all spheres without loose associations or memory issues; and she had intact grip strength and coordination, normal and functional cranial nerves without psychomotor issues and full strength, reflexes, sensation and muscle tone. Tr. 291-92. Dr. Schwab concluded that Plaintiff's prognosis was stable, and she should avoid migraine triggers including loud noise and bright lights. Tr. 292.

Plaintiff continued treatment with DENT. An MRI of the brain taken on May 6, 2016 showed no acute abnormality, mass, hemorrhage, or stroke. Tr. 311, 445. Plaintiff was seen for Botox injections on May 13, 2016 (Tr. 442-44) and had follow-up visits for headaches on July 14, 2016 (Tr. 440-42) and August 9, 2016 (Tr. 437-39). She received nerve blocks on September 8, 2016 (Tr. 435-37), and on September 22, 2016, she underwent a comprehensive polysomnography, which showed no sleep apnea or abnormal leg movement (Tr. 295-97). Plaintiff had a follow-up visit on December 15, 2016. Tr. 432-34. She was interested in continuing Botox therapy, for which an authorization was requested. Tr. 432. Plaintiff was reminded to use heat on her shoulders,

stretch her neck and back muscles, and to consider massage therapy for her cervical myofascial pain. *Id*. Refills were issued for Imitrex tablets and nasal spray. *Id*.

On March 20, 2017, Plaintiff was seen at Lakeshore with complaints of pain in her neck. Tr. 390-91. She reported she had been involved in a motor vehicle accident and was taken to the emergency room. Tr. 390. She was advised to apply warm compresses to the affected area and given a prescription for Baclofen. Tr. 391. On March 21, 2017, a cervical spine x-ray taken showed straightening, possibly due to muscle spasm. Tr. 416. On May 2, 2017, a cervical MRI showed straightening and disc herniations with mild narrowing of the canal and mild narrowing of the left neural foramina. Tr. 417-18.

Plaintiff was seen at DENT for re-evaluation of her headaches on April 4, 2017. Tr. 430-32. She received Botox injections on April 11, 2017, (Tr. 427-29) and July 11, 2017 (Tr. 425-27). On August 10, 2017, Plaintiff had a follow-up at DENT for headaches and was given trigger point injections. Tr. 422-24. On January 25, 2018, Plaintiff was seen at DENT for headaches. Tr. 420-22. She had not received Botox injections since July 2017, and her headaches had increased to 16-20 per month. Tr. 420. When she was previously on Botox therapy, her headaches had decreased by 60%. *Id*. She also reported having "cluster" headaches. *Id*. Plaintiff received a Botox injection, which she tolerated well. Tr. 420-22. Plaintiff followed up on April 19, 2018 for additional Botox injections. Tr. 450-53.

On April 26, 2018, Plaintiff presented to Lakeshore complaining of neck pain after a fall. Tr. 774. She reported she was still seeing neurology for her headaches. *Id*. She had well-controlled depression and anxiety; however, she worried "excessively" about getting migraines. Tr. 774. She was advised to avoid triggers. Tr. 776. For her neck, she reported stiffness from the fall as well as bruises on her arm and buttocks. Tr. 779. She received a Medrol Dosepak. Tr. 781. On June 18,

2018, Plaintiff returned with an upper respiratory infection. Tr. 783. She complained of foot pain with a rash on November 26, 2018. Tr. 786. She also had chest palpitations with pain, and fatigue. *Id*. She received a Holter monitor, and a stress test was ordered. Tr. 790.

Plaintiff followed up at Lakeshore on March 21, 2019, complaining of a migraine headache that had persisted for several days. Tr. 793. Her symptoms had worsened, and she had "tried multiple triptans without relief," as well as Tylenol and ibuprofen. *Id*. She received a Toradol injection. Tr. 794. On April 20, 2019, she returned with the same issue, another migraine lasting four days. Tr. 796. She described right-sided pain that had worsened since onset and not improved with medications. *Id*. She received an additional Toradol injection, and she was recommended to follow up with neurology. Tr. 798. On May 14, 2019, she was treated for an upper respiratory injection. Tr. 803. On July 19, 2019, Plaintiff presented to Lakeshore for follow up after an urgent care visit due to a fall. Tr. 805. She was using a wheelchair and had her foot elevated. Tr. 805.

On July 19, 2019, Plaintiff was also seen by Mark Pienno, PA-C ("Mr. Pienno"), at Excelsior Orthopaedics, LLP ("Excelsior"), complaining of left ankle pain after falling down a step on July 14, 2019. Tr. 866. She reported she had treated at urgent care, as well as with her primary care physician. *Id*. Plaintiff reported pain, instability, stiffness, and swelling. *Id*. On examination, Mr. Pienno noted reduced range of motion due to pain and swelling. Tr. 867. He noted that x-rays from Wellnow Urgent Care taken on July 14, 2019 showed normal alignment, and no fractures, arthritis, or bone tumors. *Id*. Mr. Pienno diagnosed left ankle sprain. *Id*.

An MRI of the left foot taken August 7, 2019 revealed a subacute fracture of the caudal portion of the left navicular bone at the talonavicular joint, bone contusion, and ligament sprain. Tr. 857. On August 9, 2019, Plaintiff was seen by Ryan Wilkins, M.D. ("Dr. Wilkins"), at Excelsior, complaining of persistent left ankle pain with swelling at the end of the day. Tr. 869.

On examination, Plaintiff had antalgic but well-coordinated gait and was using no assistive device. Tr. 870. There was mild swelling and tenderness to palpation with reduced range of motion. *Id*. Inversion stress test was positive. *Id*. MRI revealed a nondisplaced fracture of the navicular bone and talonavicular joint with bony contusion and sprain. *Id*. She was to remain in a CAM boot and was also prescribed a walker, knee scouter, and a course of physical therapy. Tr. 871.

On September 4, 2019, Plaintiff returned to Excelsior complaining of continued pain, with weakness in the morning. Tr. 872. Plaintiff had been wearing her CAM boot and was tolerating minimal weight bearing well. Tr. 872. On examination, she had reduced range of motion and reduced strength. Tr. 873. On October 18, 2019, there was mild aching pain with intermittent swelling and sharp pain. Tr. 875. On examination, there was mild swelling, tenderness to palpation over the tarsal navicular. Tr. 876. Strength and range of motion were reduced but had improved from the previous visit. Tr. 873, 876. Dr. Wilkins noted that Plaintiff was "transitioned into a well-supported shoe" but he did not believe she would "tolerate physical therapy very well at this time." Tr. 876. On December 20, 2019, examination was largely unchanged. Tr. 879.

On January 29, 2020, Plaintiff followed up with David Pochatko , M.D. ("Dr. Pochatko"), at Excelsior, continuing to complain of foot and ankle pain. Tr. 881. Plaintiff reported that a brace was not helpful, and her ankle did not "feel right." *Id*. On examination, her ankle was lax with positive interior drawer sign. Tr. 882. Plaintiff was diagnosed with left ankle sprain and "other instability" of both ankles. Tr. 883. Dr. Pochatko recommended left ankle arthroscopy with ligament reconstruction. *Id*.

On February 3, 2020, Plaintiff presented to Lakeshore for a pre-operative visit, after which she was cleared for surgery. Tr. 811, 813. Plaintiff underwent the surgery with Dr. Pochatko on

February 7, 2020, and at a follow-up visit on February 8, 2020, she remained non-weight-bearing. Tr. 884, 933.

On March 3, 2020, Plaintiff treated at Lakeshore for another upper respiratory infection, and it was noted that nasal congestion was triggering her migraines. Tr. 814.

Plaintiff had a follow-up visit with Dr. Pochatko on March 11, 2020 and reported she was doing well. Tr. 887. She was no longer taking any narcotic pain medication. *Id*. Her cast was removed; she was placed into an ankle brace and given a prescription for physical therapy ("PT") and rehab. Tr. 888.

Plaintiff received her initial PT evaluation on March 17, 2020. Tr. 903. She reported limitation with walking, stairs, transfers, and sleeping. *Id*. She was limited in ambulating, squatting, transferring, stairs, running, jumping, and sprinting, and she had decreased range of motion, joint stiffness, weakness, decreased balance, and increased pain. *Id*. Plaintiff attended a second PT visit on April 3, 2020, after which she was discharged due to COVID-19 and transitioned to a home exercise program. Tr. 912.

At her next follow-up visit with Dr. Pochatko on April 20, 2020, Plaintiff reported she was doing well, but she still used a cane outside the house. Tr. 890. There was reduced ankle range of motion on examination, and she wore an ankle brace. Tr. 891. Plaintiff restarted PT on May 7, 2020. Tr. 914-17. She reported "the exercises are going ok. I think it is slowly getting better. Stairs are still difficult." Tr. 914. Plaintiff displayed no adverse reaction from exercises initiated at last session and tolerated therapy well. Tr. 916. On May 12, 2020, she reported that her ankle was "getting there" and she wanted to return to part-time work shortly. Tr. 918. On May 18, 2020, Plaintiff reported doing well; she was not taking any medication; and physical therapy was going

well, although she complained of pain along the Achilles tendon with her first steps out of bed in the morning, and she reported residual pain after a one-mile hike. Tr. 893.

On June 30, 2020, Plaintiff followed up with Dr. Pochatko, reporting pain along her Achilles tendon and posterior heel and residual swelling. Tr. 896. She was four months post surgery, and she wanted to discuss having surgery on her right ankle as well. *Id*. On examination of the right foot and ankle, there was reduced range of motion; good muscle strength without pain produced; the ankle was lax with positive anterior drawer sign, but the foot was stable; and there was no pain on palpation of the ankle. Tr. 897. On September 16, 2020, Plaintiff again followed up with Dr. Pochatko, complaining of right foot and ankle pain that had worsened after twisting it the previous day. Tr. 899. Plaintiff was not limping; used no assistive devices; and was in no acute distress. Tr. 900. On examination of the right foot and ankle, Dr. Pochatko noted findings similar to Plaintiff's previous visit. *Id*. On the left, he noted the foot and ankle were stable; no tenderness to palpation; and good muscle strength with some pain and swelling on the left lateral ankle. Tr. 900. Dr. Pochatko assessed "right foot and ankle pain, instability, and a new problem of right peroneal tendinitis and [A]chilles tendinitis." Tr. 901. Plaintiff agreed to proceed with right ankle surgery in October 2020. *Id*.

Plaintiff was seen at Lakeshore on July 24, 2020 and assessed with moderate depression. Tr. 817-18. On September 11, 2020, she presented to Lakeshore for an evaluation for bipolar disorder. Tr. 821. She noted that psychiatry at DENT had started her on Abilify, but she "felt like she was coming out of anesthesia," and had vision problems, loss of focus, and felt "spaced out." *Id*. After contacting DENT and not receiving a call back, Plaintiff had started weaning herself off Abilify and needed further guidance. *Id*. She reported improvement of symptoms after stopping

Ability but was now having sleep troubles. She was told to follow up with psychiatry regarding discontinuing Abilify and also advised to wean off amitriptyline. Tr. 822.

As noted above, Plaintiff challenges the ALJ's RFC finding. A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); Social Security Ruling ("SSR") 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996).[3] At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d

---

[3] The Court notes that new regulations regarding the evaluation of medical evidence took effect on March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). The revisions include redefining several key terms related to evidence, revising the rules about acceptable medical sources and how the ALJ considers and articulates his consideration of medical opinions and prior administrative medical findings. See 20 C.F.R. § 416.920c (2017). Because Plaintiff's application was filed on March 23, 2016, the previous regulations are applicable to her claim.

at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

As noted above, Plaintiff contests the ALJ's reliance on the opinion of neurological consultative examiner Dr. Schwab, the only opinion in the record, to make his RFC finding. *See*

ECF No. 6-1 at 11-17. Plaintiff contends that because the ALJ assessed additional limitations not identified in any opinion, the RFC is necessarily the result of the ALJ's own lay interpretation of the raw medical evidence. *See id*. Contrary to Plaintiff's argument, however, the ALJ properly considered all the evidence in arriving at the RFC, and substantial evidence supports that finding. Furthermore, the ALJ was not required to rely on an opinion that mirrored the RFC, as Plaintiff argues. *See id*.

Plaintiff's argument wrongly presumes that RFCs are medical determinations, and thus, outside the ALJ's expertise. As explained above, however, RFC is an administrative finding, not a medical one. Ultimately, an ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record as a whole. *See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (citing *Matta*, 508 F. App'x at 56) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). The regulations explicitly state that the issue of RFC is "reserved to the Commissioner" because it is an "administrative finding that [is] dispositive of the case." 20 C.F.R. §§ 404.1527(d), 416.927(d). Moreover, there is no requirement that an ALJ's RFC finding be based on a medical opinion at all. *See, e.g.*, *Corbiere v. Berryhill*, 760 F. App'x 54, 56-57 (2d Cir. 2019) (summary order) (affirming ALJ's physical RFC assessment based on objective medical evidence); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) (affirming where ALJ rejected sole medical opinion in record speaking to mental).

Dr. Schwab opined that Plaintiff should avoid any activity that triggered a migraine attack, such as loud noises and bright lights, but assessed no other limitations. Tr. 292. The ALJ accorded Dr. Schwab's opinion "partial weight" overall and explained that he accorded "great weight" to

the portion of the opinion assessing environmental limitations due to Plaintiff's migraines as it was consistent with the totality of the record, but he gave the opinion "lesser weight in assessing disability on a long-term basis." Tr. 466. 294-352, 420-48. As the ALJ explained, the record supported exertional and postural limitations given Plaintiff's bilateral lower extremity condition and neck impairment and the MRI of the cervical spine. Tr. 466, 416-18. Thus, the ALJ reasonably found that the subsequent evidence showed that Plaintiff was more limited than Dr. Schwab opined, which warranted additional restrictions consistent with a range of sedentary exertion. Tr. 466. Contrary to Plaintiff's argument, the ALJ was entitled to rely on Dr. Schwab's opinion, even if he found greater limitations than Dr. Schwab assessed. Furthermore, Dr. Schwab's opinion was not inconsistent with the ALJ's RFC finding as every limitation assessed by Dr. Schwab was incorporated into the RFC. Tr. 462, 292.

As noted above, the regulations pertaining to RFC state that an ALJ, not a medical source, assesses RFC based on the record at large. 20 C.F.R. § 404.1545(a). The regulations pertaining to RFC likewise lists eleven types of evidence the ALJ must consider, without prioritizing medical opinions. *See* SSR 96-8p. Furthermore, the regulations provide that an ALJ is qualified to independently evaluate non-opinion medical evidence. *See* 20 § C.F.R. 404.1545(a) (directing the ALJ to assess RFC "based on all the relevant evidence in your case record," including "medical evidence."); SSR 96-8p (explicitly states that the evidence ALJs must consider in assessing RFC includes "medical signs and laboratory findings."); 20 C.F.R. § 401.1520c(c)(1) (directing the ALJ to evaluate the extent to which the source has presented relevant objective medical evidence").

Here, the ALJ reasonably assessed Plaintiff's RFC based on the overall record, including the objective medical evidence. *See* Tr. 462, 464-66. First, regarding Plaintiff's obesity, the ALJ acknowledged that the record revealed Plaintiff had a body mass index ("BMI") over 30, but he

also noted that Plaintiff exhibited grossly normal clinical examination findings. Tr. 464, 278, 867. For example, the ALJ noted that Plaintiff routinely had a regular heart rate and rhythm, lungs clear to auscultation with normal breath sounds, no neurological deficits, and normal sensation, motor strength, and gait. Tr. 464, 248, 268, 321, 349, 390, 413, 729. The ALJ also noted that Plaintiff's providers routinely encouraged Plaintiff to exercise, and no treating or examining physician had indicated that Plaintiff's obesity impacted her functional abilities. Tr. 464, 299, 304, 321, 334, 350, 387, 428, 436, 441, 452, 656, 724, 818, 875. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (lack of evidence showing functional limitation constitutes substantial evidence that limitation does not exist).

The ALJ also considered Plaintiff's March 2017 motor vehicle accident and the medical records related to her cervical spine disorder, including the diagnostic imaging and the subsequent neurology treatment records which showed that Plaintiff had only "slightly limited" range of motion in all directions as well as tenderness around associated trigger points. Tr. 464, 390, 424, 431, 441, 656, 659, 666, 673, 679, 680. Despite "slightly limited" range of motion in her neck, Plaintiff endorsed the ability to drive a car evidencing her ability to turn her neck. *See* Tr. 198, 480. Further, the record routinely reflected grossly normal strength, gait, reflexes, sensation and no focal deficits upon examinations. Tr. 464, 386, 391, 405, 712, 733, 764, 813, 822. Plaintiff also denied paresthesia, weakness, numbness, and tingling. Tr. 464, 390, 404. In any event, the ALJ accounted for any limitations related to Plaintiff's cervical spine disorder, by limiting her to a restrictive range of sedentary work, and specifically, work that did not involve operating a motor vehicle. Tr. 462, 465.

The ALJ also considered Plaintiff's bilateral lower extremity issues and accounted for any limitations by restricting Plaintiff to sedentary work without any climbing, balancing, kneeling,

crouching, or crawling, and only occasionally stooping. Tr. 462, 465-66. Although Plaintiff testified that it was her chronic migraines and resulting absenteeism that prevented her from working (Tr. 487), the ALJ acknowledged that Plaintiff also testified to having ankle pain starting in July 2019. Tr. 465. Furthermore, the ALJ considered Plaintiff's treatment at Excelsior for her ankle issues, including undergoing arthroscopy on the left ankle in February 2020 and the right ankle in October 2020. Tr. 465, 488-89, 867, 868, 883, 884. Notably, however, Plaintiff reported improvement within one week after her left ankle surgery. Tr. 884. She was doing well and had no complaints, and she was not using any narcotic pain medication. *Id*. One month following surgery, Plaintiff reported no complaints; her cast was removed, and she used an ankle brace; and she was informed she could bear weight as tolerated. Tr. 887-88. By April 20, 2020, Plaintiff was able to ambulate around the house without any assistive devices but still used a cane outside of the house. Tr. 465, 890. Plaintiff reported she took only occasional ibuprofen for discomfort. Tr. 465, 890. On May 18, 2020, Plaintiff reported she went on a one-mile hike (*albeit* with some residual pain). Tr. 893. She was not limping or using any assistive devices; her PT was discontinued; and she was provided a note allowing her to return to work ten hours per week. Tr. 894. Plaintiff testified that she returned to her part-time work as a pharmacy technician approximately three to four months after her February 2020 left ankle surgery. Tr. 482, 488.

The ALJ also considered and noted that treatment records through September 2020 showed that Plaintiff walked with a normal gait; had full strength in her extremities; and had no neurological deficits. Tr. 465, 405, 764, 867, 870, 873, 900. Plaintiff also continued working approximately 10 to 15 hours per week as a pharmacy technician until September 2020, when she underwent right ankle surgery. Tr. 465, 481, 901. As the ALJ noted, Plaintiff testified at the October 2020 hearing, only a month after her right ankle surgery, that she managed her ankle pain

with only ibuprofen. Tr. 463, 489. Plaintiff also testified that she expected to return to her part-time employment as a pharmacy technician within six weeks from the date of hearing. Tr. 465-66, 481, 489.

In any event, the ALJ's decision reflects that he considered the evidence documenting Plaintiff's ankle pain and weakness and reasonably accounted for Plaintiff's bilateral ankle impairments by limiting her to sedentary work, which requires largely sitting, and also restricted Plaintiff from all climbing, balancing, kneeling, crouching, and crawling, and limited Plaintiff to only occasional stooping. Tr. 462. Moreover, Plaintiff did not allege any limitations related to sitting (*see, e.g.*, Tr. 200, 487), and no doctor indicated that Plaintiff was restricted in her ability to sit. *See Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits."); *see also Eusepi v. Colvin*, 595 F. App'x 7, 8 (2d Cir. 2014); *Reynolds v. Colvin*, 570 F. App'x 45, 47 (2d Cir. 2014).

The ALJ also reasonably accounted for Plaintiff's limitations related to her migraine headaches by restricting Plaintiff to work with quiet noise environments and no exposure to bright lights. Tr. 462, 465. As the ALJ acknowledged, the record revealed that prior to the relevant period, Plaintiff sought treatment at the emergency room for migraines in September 2010, December 2010, November 2011, and May 2013; at that time, she exhibited grossly normal neurological findings including that she was alert in all spheres, had intact cranial nerves, motor strength, sensation, reflexes and cerebellar function, and had a steady gait. Tr. 465, 247-48, 251-55, 264-65, 271-72. During the relevant period, Plaintiff sought treatment for her migraines at DENT, where a May 2016 brain MRI showed no abnormality, and treatment records generally revealed

grossly normal clinical findings. Tr. 465, 278, 299, 311, 335, 349, 445, 368, 386, 407, 431, 441, 669, 686, 696, 712, 738, 781, 822. The ALJ also considered an updated MRI from June 2019 which, again, revealed normal findings. Tr. 465, 702-03.

Similarly, the ALJ noted that Dr. Schwab's examination findings indicated that Plaintiff exhibited grossly normal gait, had intact grip strength and coordination, normal and functional cranial nerves without psychomotor issues and full strength, reflexes, sensation and muscle tone, and was oriented in all spheres without loose associations or memory issues. Tr. 465, 291-92. Ultimately, Dr. Schwab concluded that Plaintiff's prognosis was stable, and she should avoid migraine triggers including loud noise and bright lights, which, as previously discussed, the ALJ incorporated into the RFC. Tr. 465, 292.

In addition to the overall objective evidence and Dr. Schwab's opinion, the ALJ also appropriately considered that Plaintiff sought only conservative treatment for her impairments, including Botox and trigger point injections for her migraines (Tr. 419-48), massage therapy for cervical myofascial pain (Tr. 432, 756), and took only ibuprofen for pain (Tr. 390, 489). Tr. 464-65. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v) (medication and treatment received are considered when evaluating the intensity and persistence of a claimant's symptoms); *see also Penfield v. Colvin*, 563 F. App' x 839, 840 (2d Cir. 2014) (conservative treatment weighed against a finding of disability); *Netter v. Astrue*, 272 F. App' x 54, 56 (2d Cir. 2008) (an ALJ may consider a claimant's conservative treatment as additional evidence supporting the ALJ's determination); *Shaffer v. Colvin*, No. 1:14-CV-00745, 2015 WL 9307349, at *5 (W.D.N.Y. Dec. 21, 2015) (ALJ properly discredited the claimant' s allegations because her treatment was routine and conservative, consisting of medication management and physical therapy).

Plaintiff's significant activities and abilities also lend substantial support to the ALJ's RFC finding. Tr. 464, 195-216, 290, 481-84. As the ALJ acknowledged, Plaintiff endorsed the ability to handle her personal hygiene, prepare simple meals, perform household chores, visit with friends and family, shop, use a computer and smartphone, handle her finances, watch television, drive a motor vehicle, and care for her pets and stepson. Tr. 464, 195-215, 290, 510-15. *See Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (finding that the ALJ properly relied on the claimant's reported daily activities, including walking her dogs and cleaning, in concluding that the claimant could perform some work); *Poupore*, 566 F.3d at, 307 (finding that the claimant' s activities, including occasional cleaning, childcare, and driving, supported an RFC finding for light work).

Plaintiff was also encouraged by her providers to exercise, and she reported she did so as often as three times per week. Tr. 464, 299, 304, 321, 334, 350, 387, 428, 436, 438, 441, 452, 656, 724, 818, 87. This evidence is consistent with the ALJ's finding that while Plaintiff's conditions were limiting, they did not preclude sedentary work. *See Christina D. v. Comm'r of Soc. Sec.*, No. 20-CV-30, 2021 WL 2224204, at *5 (W.D.N.Y. June 2, 2021) (finding that the recommendation by the claimant's medical providers that the claimant should exercise and stay active demonstrated that those medical providers believed the claimant to be capable of physical activity); *Nix v. Colvin*, No. 15-CV-0328-FPG, 2016 WL 3681463, at *5 (W.D.N.Y. July 6, 2016) (holding that a treating provider's recommendation that claimant exercise was not inconsistent with sedentary work).

Furthermore, Plaintiff had significant work activity during the relevant period, which the ALJ reasonably considered. Tr. 464, 166-67, 481-84, 630-34; *see* 20 C.F.R. § 404.1571 ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level . . . . Even if the work you have done was not substantial gainful activity, it may show that you are able to do

more work than you actually did."); *see Rivers v. Astrue*, 280 F. App'x 23 (2d Cir. 2008) (while claimant's work during the relevant period did not meet the threshold for substantial gainful activity, he worked at levels consistent with light work); *Cabrero-Gonzalez v. Colvin*, No. 13-CV-6184-FPG, 2014 WL 7359027, at \*19 (W.D.N.Y. Dec. 23, 2014) (ALJ appropriately discredited claimant's allegations in part because he worked after his alleged disability onset date). Thus, Plaintiff's significant activities and acknowledged abilities lend support for the ALJ's RFC finding for a restrictive range of sedentary work. Tr. 462.

Based on the foregoing, there was more than substantial support for the ALJ's RFC finding, including Dr. Schwab's opinion the objective medical evidence, treatment records showing normal examination findings and mostly conservative treatment, as well as Plaintiff's acknowledged activities and abilities. Accordingly, the Court finds no error.

Plaintiff's argument that the ALJ failed to further develop the record by not recontacting one of her sources or obtaining a medical expert opinion is similarly without merit. *See* ECF No. 6-1 at 15-16. First, Plaintiff identifies no actual error, but rather, restates her overall argument that the RFC is not based on substantial evidence. As such, Plaintiff merely seeks a reweighing of the evidence in her favor, which is inappropriate under the substantial evidence standard of review. *See Pellam v. Astrue*, 508 F. App'x 87, 91 (2d Cir. 2013) ("We think that Pellam is, in reality, attempting to characterize her claim that the ALJ's determination was not supported by substantial evidence as a legal argument in order to garner a more favorable standard of review."); *see also Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it.").

An ALJ's duty to develop the record, even where Plaintiff was represented, as here, is "generally affirmative," arising from the Commissioner's regulatory obligations to develop a

complete medical record before making a disability determination. *See Perez v. Chater*, 77 F.3d. 41, 47 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d), (e)12) (other citation omitted); *see also Pratts v. Chater*, 94 F.3d 34, 47 (2d Cir. 1996) (same). Therefore, the Commissioner's regulations require the agency and/or the ALJ, to develop Plaintiff's "complete medical history," or "the records of his medical [or treating] source(s)," by making "every reasonable effort to help [Plaintiff] get medical evidence from" such treating sources. 20 C.F.R. § 404.1512(b)(1)(i)-(ii)).

Nevertheless, an ALJ's duty to develop the record is not limitless. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x at 34. Most basically, an ALJ need not further develop the record "when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'" *See Janes v. Berryhill*, 710 F.App'x 33, 34 (2d Cir. Jan. 30, 2018) (summary order (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996); *see also Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. Jan. 8, 2015) (summary order) (although an ALJ has a duty to develop the record, where there are no obvious gaps and the ALJ possesses a complete medical history, he is under no obligation to seek a treating-source opinion (citations omitted)).

The record in this case reflects that the ALJ considered all the evidence during the alleged period of disability, including all the treatment records that were provided by Plaintiff's practitioners; the examination report of the consultative examiner; and Plaintiff's statements about her symptoms, limitations, and daily activities. Because the record contained sufficient evidence to support the ALJ's decision, nothing more was required of him. *See Schillo v. Kijakazi*, 31 F.4th 64, 76 (2d Cir. 2022) (because "there was a complete record before the ALJ consisting of medical opinions, treatment notes, and test results from 2016 to 2018, as well as [claimant]'s own testimony," the ALJ was not under obligation to pursue more information from a particular physician.).

Additionally, Plaintiff's argument again relies on the erroneous belief that an ALJ cannot make an RFC finding without a medical opinion. However, for the reasons previously explained, this argument is incorrect.

Finally, Plaintiff argues that Dr. Schwab's opinion was stale, and thus, the RFC was not supported by substantial evidence. *See* ECF No. 6-1 at 17-21. A medical opinion may be stale if it does not account for a plaintiff's deteriorating condition. *See Carney v. Berryhill*, No. 16-CV-269, 2017 WL 2021529, at *6 (W.D.N.Y. May 12, 2017). "However, a medical opinion is not necessarily stale simply based on its age." *Biro v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 464, 470 (W.D.N.Y. 2018). Nor is an opinion stale merely because the plaintiff received treatment subsequent to that date. *See Alexander v. Comm'r of Soc. Sec.*, 2020 WL 5642184, *3 (W.D.N.Y. 2020) ("[a] subsequent surgery, however, is insufficient, standing alone to render a medical opinion stale") (collecting cases); *Hernandez v. Colvin*, 15-CV-6764, 2017 WL 2224197, *9 (W.D.N.Y. 2017) (citing *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order)) ("[A] medical opinion is [not] stale merely because it pre-dates other evidence in the record, where . . . the subsequent evidence does not undermine [the opinion evidence].").

Overall, remand is warranted where more recent evidence in the record "directly contradict[s] the older reports of [claimant's] functioning on which the ALJ relied" and the ALJ failed to analyze the more recent evidence. *Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642 (2d Cir. 2020). Where the submitted evidence did not directly contradict a doctor's opined limitations, and further, the ALJ analyzed the recent evidence, the doctor's opinion was not impermissibly stale. Such is the case here.

Plaintiff argues that she had worsening migraines after Dr. Schwab's 2016 consultative examination, and her ankle impairment did not occur until 2019. *See id*. at 19-20. Contrary to Plaintiff's argument, however, the ALJ considered evidence showing that Plaintiff's migraines did

not significantly worsen over time since Dr. Schwab's opinion, and the ALJ also specifically acknowledged that Plaintiff was more limited from an exertional and postural standpoint than Dr. Schwab assessed, which the ALJ explained, was his reason for affording Dr. Schwab's overall opinion only partial weight. Tr. 466.

First, the evidence does not support Plaintiff's allegations of worsening migraines since Dr. Schwab's May 2016 consultative examination. *See Camille v. Colvin*, 652 F. App'x 25, 28 (note 4) (2d Cir. 2016) (rejecting the argument that a State agency physician's opinion was stale where the evidence submitted later did not differ materially from the evidence reviewed by the State agency physician). As the ALJ acknowledged, Plaintiff's primary care physician noted in October 2017 that Plaintiff's migraines were stable with injections and Botox treatment. Tr. 465, 406. Moreover, the ALJ considered a June 2019 brain MRI which reflected no abnormality and was noted as evidencing no change from May 2016. Tr. 465, 311, 445. Furthermore, the ALJ considered Plaintiff's Botox treatment and treatment records from DENT from 2017 and 2018, indicating that Botox therapy resulted in at least a 50-75% decrease in her headaches, and Plaintiff denied any problems with Botox injections. Tr. 465, 420, 425, 427. While Plaintiff points to receiving Toradol injections during primary care visits at Lakeshore in March and April 2019 (*see* ECF No. 6-1 at 19), those records indicate that Plaintiff had not been to DENT in several months. Tr. 793, 796. Notably, during her next visit to Lakeshore on May 14, 2019, Plaintiff reported taking her medication as prescribed and feeling well. Tr. 799. She was exercising twice per week and back to working "regular duty," *albeit* part-time. Tr. 799. Thus, the ALJ reasonably afforded great weight to Dr. Schwab's opinion that Plaintiff should avoid bright lights and loud noises as it was consistent with the overall record and incorporated those restrictions into the RFC. Tr. 462, 465, 292.

Plaintiff next argues that Dr. Schwab's opinion was stale because Plaintiff subsequently underwent surgery on her ankles and attended physical therapy. *See* ECF No. 6-1 at 19-21. However, in affording Dr. Schwab's overall opinion only partial weight, the ALJ acknowledged that Plaintiff had more exertional and postural limitations than Dr. Schwab assessed. Tr. 466. While Dr. Schwab's opinion assessing no exertional or postural limitations was supported by his normal examination findings at the time revealing (Tr. 291-92), the ALJ found that the overall record evidenced additional limitations, and as shown above, made an RFC finding for a restrictive range of sedentary work based on the record as a whole. Tr. 462. *See Baker v. Berryhill*, No. 1:15-cv-00943-MAT, 2018 WL 1173782, at *2 (W.D.N.Y. Mar. 6, 2018) ("Where an ALJ makes an RFC assessment that is more restrictive than the medical opinions of record, it is generally not a basis for remand.") (internal quotation marks and citations omitted)); *Castle*, 2017 WL 3939362, at *3 ("[T]he fact that the ALJ's RFC assessment did not perfectly match [the consultative examiner's] opinion, and was in fact more restrictive than that opinion, is not grounds for remand."). Plaintiff's argument again relies on the erroneous assumption that an ALJ is required to rely on an opinion that mirrored the RFC, which the Court has already explained, is incorrect. Accordingly, Plaintiff's argument is meritless.

As detailed above, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which he has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the

Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault*, 683 F.3d at 448 (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

For all the reasons discussed above, the Court finds that the ALJ properly considered entire record, including the medical opinions the and the treatment reports showing improvement after surgery and pain controlled with medication, and the ALJ's findings are supported by substantial evidence. Accordingly, the Court finds no error.

**CONCLUSION**

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 6) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 7) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE